1
2
3
4
5
6
7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ORLANDO VIBANCO,                        Case No.   1:17-cv-00926-AWI-JDP (HC)

12              Petitioner,                  FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITION FOR WRIT OF HABEAS
13        v.                                 CORPUS AND TO DECLINE TO ISSUE A
                                             CERTIFICATE OF APPEALABILITY
14   SHAWN HATTON,
                                             OBJECTIONS DUE IN THIRTY DAYS
15              Respondent.
                                             ECF No. 15
16
                                             ORDER DENYING PETITIONER'S
17                                           MOTIONS FOR THE APPOINTMENT OF
                                             COUNSEL
18
                                             ECF Nos. 25, 26
19

20        Petitioner Orlando Vibanco, a state prisoner proceeding without counsel, seeks a writ of

21   habeas corpus under 28 U.S.C. § 2254.  ECF No. 15.  Petitioner claims that his trial and appellate

22   counsel were ineffective and that he is innocent of the crimes of which he was convicted.  *See*

23   *generally id*.  For the reasons below, the undersigned recommends that the court deny the

24   petition.

25   **I.      Background**

26        In 2013, a jury sitting in Fresno County convicted petitioner of battery with serious bodily

27   injury and second-degree robbery with a great bodily injury enhancement.  *See People v.*

28   *Vibanco*, No. F0681712015, Cal. App. Unpub. LEXIS 9026, at *15 (Dec. 16, 2015).  Petitioner

1

1  was sentenced to 32 years to life in state prison.  *Id.*  The undersigned sets forth below the facts of

2  the underlying offenses, as stated by the California Court of Appeal.  A presumption of

3  correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d

4  998, 1010-11 (9th Cir. 2015).

5

6           **Facts**

7          On the night of October 24, 2010, Gabriel Ocon (Ocon) walked out
           of the FoodMaxx store near Highway 99 and Fresno Street and
8          headed to his car in the parking lot.  Defendant and Netisha Embry
           (Embry) approached him and defendant asked for a ride.  Ocon did
9          not know them and had never seen them before.

10         Ocon testified defendant spoke to him in "[n]ot so good Spanish"
           and asked for a ride to some place on Jensen.  Ocon said no.
11         Defendant insisted and said Embry had cancer, and she could not
           walk.  Ocon finally agreed because defendant said Embry was sick.
12         Embry did not ask for the ride or say anything to him.

13         Ocon got into the driver's seat of his two-door car.  Defendant
           entered the car through the passenger door and sat in the rear
14         passenger seat.  Embry sat in the front passenger seat.
           Ocon testified that he had placed a full-size pool cue in the car,
15         which was lying lengthwise between the center console and the
           front passenger seat.  He did not have any real or fake firearms in
16         the vehicle.

17         Ocon testified defendant said they wanted to go to Golden State and
           Jensen.  Ocon drove south on Golden State.  When he reached
18         Jensen, defendant said the place was not there and they should go
           further.  Defendant told Ocon to turn onto "North Street," but
19         defendant never said exactly what he was looking for.  Ocon drove
           to North Avenue, but defendant again failed to explain where he
20         wanted to go.  Defendant never told Ocon that he was going the
           wrong way.

21         As Ocon was driving around, defendant asked to borrow Ocon's
           iPhone.  He did not say why he wanted it.  Ocon passed his iPhone
22         to defendant in the back seat.  He did not see defendant use it.

23         Ocon started to become suspicious of the situation.  Ocon decided
           to get on to northbound Highway 99 and head back to Jensen
24         Avenue.  He intended to drop off defendant and Embry at Jensen
           and Golden State, as defendant originally requested.

25
           Ocon told defendant to return his iPhone.  Defendant claimed he
26         placed it on the center console, and then acted like he was looking
           for it in the backseat.  Ocon believed defendant hid the iPhone or
27         put it in his pocket.

28

                                      2

**Defendant Attacks Ocon**

Ocon turned off Highway 99 at Jensen Avenue.  There were several fast food restaurants nearby, but Ocon did not think to drive into the well-lighted parking lot.  Instead, he stopped on the side of the street by the highway embankment.  Ocon again told defendant to return his iPhone.  Defendant did not do so.

Ocon testified defendant told him to get out of the car.  Defendant began to hit Ocon in the face and head.  Ocon tried to defend himself and turned around and grabbed defendant's hands.  Defendant grabbed the pool cue and repeatedly hit Ocon's head with it.  The stick broke into two pieces.

As Ocon struggled with defendant, Embry got out of the passenger door.  Defendant continued to beat Ocon with one piece of the pool cue.  At some point, both defendant and Ocon got out of the car through the passenger door.  Ocon testified he might have used part of the pool stick to hit defendant.

Ocon testified that as defendant beat him, defendant told Embry to get Ocon's key from the car.  Ocon was not sure if she took the key because he was preoccupied with defendant.

Ocon testified he punched defendant with his elbow and defendant fell down.  Ocon assumed Embry had already taken his car key from the ignition.  Ocon kept his extra car key in his wallet and intended to retrieve it so he could escape in the car.  While defendant was on the ground, Ocon pulled out his wallet, which also contained his identification and $200.  As he looked for the key, defendant got up and hit Ocon in the head.  Ocon testified he did not remember what happened after that, until he woke up in an ambulance.

**The Police Find Ocon**

The police received a call from patrons at the nearby fast food restaurants about a possible robbery at Highway 99 and Jensen.  When the officers arrived at the Jensen offramp, Ocon was sitting on the ground next to his car.  He was disheveled.  Ocon was bleeding and his shirt was covered with blood.  He had swelling, cuts, and bruises to his face.

Officer Zavalza spoke to Ocon and heard his account of giving a ride to the man and woman.  Ocon said the man attacked him in his car.  Ocon also said that he grabbed the pool cue to protect himself, but defendant took it away and beat Ocon with it.

The police searched the area around Ocon's car and found his car key, one piece of the broken pool cue, and his wallet.  The wallet contained his identification, but there was no money.  The police found the other half of the broken pool cue inside the car, on the driver's side of the backseat.  They also found a replica toy handgun in the car, on the back floorboard behind the passenger

3

seat.  The police showed the broken pool cue to Ocon, who said defendant hit him with the stick.

**Defendant's Statements**

While officers spoke to Ocon and obtained medical assistance for him by the off ramp, additional officers responded to the nearby fast food restaurants based on the dispatch that a man and women were walking away from the area.  Sergeant Cancio saw defendant and Embry walking around one of the restaurants.  He drove behind them and asked them to stop.  They complied and were cooperative. Cancio did not notice any injuries on either defendant or Embry. Embry said she had cancer.

Officer Bunch arrived at the parking lot and found defendant and Embry sitting on the ground near one of the restaurants.  Officer Cancio was standing near them.  Bunch testified it was "pretty clear" defendant had been involved in a physical altercation because he was sweating and there was blood on his shirt. Defendant did not have any visible injuries to his face or hands.

Officer Bunch testified the officers were trying to piece together what happened at the two locations.  Embry complained of pain on her side and said Ocon had assaulted her.  Bunch asked Embry if she needed an ambulance, and she said yes.

Officer Bunch testified that defendant "began to explain to us what had occurred."  Defendant said they had been at the FoodMaxx parking lot, and they needed a ride to a motel.  Defendant said they got a ride from Ocon, but he became "creepy," drove past their motel, and headed into the "outskirts" of the country.  Defendant saw a pool cue in the car, and he was going to grab it, but Ocon took it away.  Defendant said Ocon grabbed Embry's hair.

Defendant said he struggled with Ocon to release Embry.  Ocon hit defendant with the pool cue.  Defendant said Ocon stopped the car, and an unknown, black male arrived and rescued them from Ocon. Defendant and Embry walked away from Ocon's car.  Defendant said they were getting away from Ocon when the police arrived.

**Discovery of the iPhone**

Officer Bunch searched defendant and found an iPhone in his pocket.  Bunch said, "Oh, you have an iPhone."  Defendant said yes.  Bunch placed it on the restaurant's windowsill, and it fell down.  Bunch apologized, and defendant said no problem.  Bunch asked defendant why he did not immediately call 911 on his iPhone for help.  Defendant said the iPhone was not activated.

Officer Bunch also found two small pieces of plastic in defendant's pocket.  The two pieces were later matched to the replica toy handgun found in the backseat of Ocon's car.

4

The officers called Ocon's iPhone number.  The iPhone which they found in defendant's pocket started to ring.  Defendant heard the iPhone ring, and he "blurted out, 'that's his phone.'"  Officer Bunch asked what he meant.  Defendant said the iPhone belonged to the man who hit him with the pool cue.

### **Identification of the Suspects**

Ocon was treated at the scene by emergency personnel.  Ocon testified that he recalled being taken to the parking lot of the fast food restaurant for an infield showup.  Officer Cancio testified Ocon immediately identified defendant and Embry as the two people who were in his car, and defendant as the person who assaulted him.

After Ocon identified defendant, Officer Zavalza advised defendant of the *Miranda* warnings and asked him about the incident.  Defendant said he was in the supermarket parking lot with Embry, and Embry asked Ocon for a ride.  Defendant again said Ocon "wouldn't turn on the streets that they were telling him to turn, so they drove around for several minutes until they ended up northbound [on Highway] 99 at the Jensen . . . off-ramp . . .."

Defendant said he asked to use Ocon"s iPhone so he could look up the motel's address.  Defendant said Ocon was acting "weird" and "trying to grab on to Embry."  Defendant said Ocon took the Jensen off ramp and stopped the car.  Ocon turned around and began hitting defendant.

Officer Zavalza testified he had already seen the multiple injuries on Ocon's face, and asked defendant if he hit Ocon.  Defendant replied that he just "blocked" Ocon's punches and said he did not hit or touch Ocon.  Zavalza asked defendant to explain how Ocon received his multiple injuries.  Defendant did not respond to this question.  Zavalza asked defendant whether he hit Ocon with the pool cue; defendant did not respond.  Zavalza also asked defendant why Ocon's wallet was found on the street by his car, and defendant again failed to respond.

The officers did not see any injuries on defendant that would have been consistent with being hit with a pool cue.  Defendant did not require any medical assistance, and he was not taken to the hospital.

Ocon was taken to the hospital and remained there for three days.  He suffered multiple open cuts, abrasions, and bruises to his eyes, nose, chin, head, hands, and chest.  Some of the cuts required stitches and left scars.  While he was at the hospital, the officers returned his iPhone, car keys, and wallet.  His wallet still contained his identification and the extra car key, but the $200 was missing and was never recovered.

### **Defendant's Trial Testimony**

At trial, defendant testified and again claimed that Ocon attacked him and Embry.  Defendant testified that on the day of the incident,

5

he was visiting his friend Darcy, who lived at either the Fresno Inn or the Motor Lodge.  As he left Darcy's motel room, Embry arrived in a car driven by an older man.  Defendant thought she was attractive and "hollered" at her.  Embry was wearing "sexy" clothes and said she was a dancer.  Defendant thought another friend would be interested in having Embry dance for him.  Embry agreed to meet his friend.  Defendant got into the car with Embry and the older man, who drove them to the friend's house on G Street.  Defendant and Embry went into the friend's house.  Embry did "a little thing" with the friend, and they scheduled something for another time because the friend's wife was in the house.

Defendant testified they walked out of his friend's house and discovered Embry's driver had left.  Defendant felt responsible for Embry because he had invited her into a bad neighborhood.  They walked toward FoodMaxx to look for a ride.  Embry said she could not walk any further, her stomach hurt, and she had cervical cancer.

Defendant approached people in the parking lot and asked for ride, but they said no.  Defendant saw Ocon and told Embry that she should ask for a ride because everyone else was telling him no.  Embry asked Ocon for a ride.  Ocon replied in Spanish, and defendant realized that he did not speak English.  Defendant walked over and asked Ocon for a ride in "not very good Spanish."  Ocon did not seem sure about it.  Defendant told Ocon that Embry was sick and Ocon agreed.

Defendant testified he asked Ocon to take them to the Fresno Inn or Motor Lodge motel, and gave him directions to "one of those two motels."  Ocon drove in the opposite direction.  Defendant told Ocon that he was going the wrong way.  Ocon kept driving south and ended up on Golden State.

Defendant testified Ocon began to act "creepy" and "weird" because he would not respond to defendant.  Ocon drove through dark areas and stopped the car three times.  Defendant again told Ocon they were going the wrong way, but Ocon did not respond.  Embry "scooted" towards the door and asked what he was doing.  Defendant replied that he did not know.  Defendant became scared and did not know what Ocon was going to do.  Defendant noticed Ocon was looking at a map on his iPhone.

Defendant testified Ocon was driving around dark streets, and then he turned onto northbound Highway 99.  Defendant told him to turn on Jensen and leave them at the fast food restaurants.  Defendant asked to borrow Ocon's iPhone so he could see the map that Ocon was looking at.  Defendant also thought he could use the phone to call the police if Ocon "did some weird stuff like went crazy or something on us."

Ocon gave the iPhone to defendant, but defendant did not know how to use the map feature or place a call.  Defendant placed Ocon's iPhone on the center console.  It fell onto the floorboard of the backseat.  Defendant picked up the iPhone and put it in his pocket.  As he did so, defendant "accidentally" picked up pieces of

6

plastic from the backseat, which were later matched to the toy gun.

Defendant testified he saw the pool cue and asked Ocon about it. Ocon became "more aggressive" and shoved it deeper between the seats. Defendant became "scared for my life."

Ocon stopped the car and asked defendant what they were going to give him for the ride. Defendant assumed Ocon was referring to Embry, and said, "[D]ude, that's not happening." Defendant told Embry to get out of the car. Ocon grabbed the pool cue and hit defendant's head with the stick while defendant was still inside the car. Defendant tried to block the blows with his arms and the cue broke. Ocon crawled into the backseat and got on top of defendant. Embry ran to the driver's door and tried to pull Ocon off defendant. The car engine was still running, so she removed the key from the ignition.

Defendant testified Ocon stopped wrestling with him, and pulled Embry's hair and necklace. Defendant pulled Ocon and Embry apart. Embry ran from the car and screamed for help. Defendant tried to get out of the backseat, but Ocon grabbed his shirt. Defendant managed to get out of the car, but Ocon held onto him.

Defendant and Ocon faced each other outside the car, and they were still "tussling." Ocon used half of the pool cue and hit defendant's head. "I'm fighting for my life and he's trying to kill me or whatever with that pool stick." Defendant testified he never punched Ocon with his fists, but he again blocked the blows with his arms and tried to take away the pool cue.

Defendant testified that as he tried to protect himself, Ocon jumped on his back and choked him. Defendant bit Ocon's finger, but Ocon would not let him go. Defendant used the back of his head to "head butt" the front of Ocon's face three or four times.

Defendant testified he and Embry were screaming for help. An African American man arrived and told Ocon to get off defendant. Ocon ignored the man and kept choking defendant. The man pulled Ocon off defendant's back. Ocon turned and hit the man with the pool cue. Defendant and Embry ran to the fast food restaurants because another bystander said the police were on the way.

Defendant admitted the police found Ocon's iPhone in his pocket. Defendant said he never told the police that the iPhone belonged to him. Defendant testified he told the officer that he did not know how to use it to call for help, but the officer would not listen to him. Defendant did not know how Ocon's wallet ended up on the street.

Defendant believed Ocon received the injuries to his face when Ocon was on his back and he butted Ocon's face with the back of his head. He thought Ocon received the bruises on his chest when they were "in the scuffle in the car." Defendant believed the blood on the back of his shirt was from Ocon's hands.

7

1
2
> Defendant was impeached with his prior felony convictions for attempted robbery in 1989, second degree burglary in 1991, and robbery in 2005.

3

4  *Vibanco*, No. F0681712015, Cal. App. Unpub. LEXIS 9026, at *1-15.

5  **II.     Discussion**

6          A federal court can grant habeas relief when a petitioner shows that his custody violates

7  federal law.[1] *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

8  (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

9  Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

10  562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

11  last state court to have issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v.*

12  *Sellers*, 138 S. Ct. 1188, 1192 (2018).  In general, § 2254 requires deference to the state court

13  system that determined petitioner's conviction and sentence.

14          Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been

15  "adjudicated on the merits in state court proceedings" only if he shows that the state court's

16  adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable

17  application of, clearly established Federal law, as determined by the Supreme Court of the United

18  States," or (2) "based on an unreasonable determination of the facts in light of the evidence

19  presented in the State court proceeding."  28 U.S.C. § 2254(d).  The petitioner's burden is great.

20  *See Richter*, 562 U.S. at 103 ("[To gain relief under § 2254(d)(1), a petitioner] must show that the

21  state court's ruling . . . was so lacking in justification that there was an error well understood and

22  comprehended in existing law beyond any possibility for fairminded disagreement."); *see Davis*

23  *v. Ayala*, 576 U.S. 257, 271 (2015) (quoting § 2254(e)(1)) ("[Under § 2254(d)(2),] [s]tate-court

24  factual findings . . . are presumed correct; the petitioner has the burden of rebutting the

25  presumption by 'clear and convincing evidence.'").

26
27
28

---

[1] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-103 (emphasis added).

### a.   Ineffective Assistance of Counsel

The two-step inquiry from *Strickland v. Washington* governs a federal habeas petitioner's claim of ineffective assistance of counsel. 466 U.S. 668, 687 (1984). First, a criminal defendant must show some deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* This court must ask whether the attorney's strategic choices were reasonable under "prevailing professional norms" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 688-89. The entire performance of the attorney must be considered; it is "difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *See Richter*, 562 U.S. at 111 (2011). Second, the defendant must show that the deficient performance caused him prejudice. *See Strickland*, 466 U.S at 687. This requires petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

On habeas review, when filtered through § 2254(d)'s fairminded-jurist standard, the *Strickland* requirements become even more deferential, and the court must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. If there is even one reasonable argument that counsel did not violate the *Strickland*

9

1    standard—even if the state court has not identified the argument—then the petitioner cannot

2    obtain habeas relief. *See id.* at 106.

3                                    **i.  Trial Counsel**

4         Petitioner contends that he received ineffective assistance of trial counsel because his

5    counsel: (1) did not dispute the sufficiency of the evidence of robbery; (2) did not move to set

6    aside the robbery charge; (3) did not lodge a defense for the battery of Ocon; and (4) wrongfully

7    allowed a police officer to testify that petitioner was on parole at the time of the incident.  ECF

8    No. 15 at 11-12.  Petitioner's claim, made in a habeas petition, was summarily rejected by the

9    California Supreme Court.  Lodged Doc. No. 41.  Where a state court's decision is

10   unaccompanied by an explanation, this court presumes that the decision was made on the merits

11   and afford it § 2254(d) deference. *See Richter*, 562 U.S. at 100.  In such cases, this court "must

12   determine what arguments or theories supported or . . . could have supported, the state court's

13   decision; and then . . . ask whether it is possible fairminded jurists could disagree that those

14   arguments or theories are inconsistent with the holding in a prior decision of . . . [the U.S.

15   Supreme] Court." *Id*. at 102.

16                          **1.  Sufficiency of evidence for robbery charge**

17        Petitioner contends that his counsel was ineffective because he failed to challenge the

18   sufficiency of the evidence of robbery.  ECF No. 15 at 11.  Specifically, petitioner argues that his

19   counsel failed to advance petitioner's theory that he borrowed Ocon's phone and had no intention

20   of robbing him. *Id*.  Because the trial court record directly contradicts petitioner's assertions, his

21   claim should be rejected.

22        Petitioner's counsel presented petitioner's borrowed phone theory through petitioner's

23   own trial testimony and in the closing argument. *See* RT 13, 14.  At trial, petitioner testified that

24   Ocon gave him permission to use the phone, that petitioner put the phone on the center console,

25   that the phone fell down on the floorboard, and that petitioner put the phone in his pocket with no

26   intent to take it.  RT 14:1660.  Petitioner's counsel also elicited testimony from petitioner that

27   petitioner did not intentionally lie to the police officer about his ownership of the phone. *Id*. at

28   1692.  Petitioner testified that he believed the police officer was asking petitioner whether the

                                            10

1   wallet in found in his pocket belonged to him—to which petitioner answered in the affirmative.

2   *Id*.  Finally, petitioner testified that he neither took Ocon's wallet or keys nor knew their location.

3   *Id*. at 1694.

4        In his closing argument, petitioner's counsel argued that the evidence presented at trial

5   was insufficient to find petitioner guilty of robbery.  Petitioner's counsel contended that "the

6   wallet and keys cannot be considered for the robbery charge because Mr. Ocon stood up there and

7   said he did not remember who took the wallet, who took the car keys, and there was no testimony

8   that they were ever found in any relationship to [petitioner]."  *Id*. at 1754.  Petitioner's counsel

9   asserted that the mere placement of Ocon's phone in petitioner's pocket was insufficient to prove

10  petitioner was guilty of robbery.  *Id*. at 1759.  Petitioner's counsel reminded the jury that

11  petitioner did not take Ocon's wallet, keys, car, or money.  *Id*. at 1759.  Petitioner's counsel

12  argued that Ocon allowed petitioner to borrow his phone, that Ocon never asked petitioner to

13  return his phone, and that petitioner did not intend to permanently deprive Ocon of his phone.  *Id.*

14  Petitioner's counsel recounted each of the elements of robbery for the jury and argued that the

15  prosecution had not met its burden to prove each element beyond a reasonable doubt; petitioner's

16  counsel supported each of his assertions with evidence in the record.  *Id*. at 1760.

17       The undersigned cannot find that petitioner's counsel's performance was deficient.

18  Petitioner has not pointed to anything additional that his counsel could have done to call the

19  sufficiency of the evidence into question.  Moreover, because petitioner has not demonstrated any

20  additional evidence that his counsel could have presented to dispute the robbery charge, he has

21  failed to show how he was prejudiced by his counsel's actions—meaning he has not shown that

22  there is a reasonable probability that the result of the proceeding would have been different absent

23  his attorney's alleged failings.  Petitioner's claim should be rejected.

24               **2.  Motion to set aside robbery charge**

25       Petitioner contends that his trial counsel was ineffective based on his failure to move to set

26  aside the robbery charge by filing what is commonly known as a "995 motion."  ECF No. 15 at

27  11.  In California, after a defendant has been held to answer for a charge, he can move to set aside

28

1    the charge on the theory that he "has been committed without reasonable or probable cause."[2]

2    Cal. Pen. Code § 995(a)(2)(B).  Such cause is found where the "state of facts . . . would lead a

3    man of ordinary care and prudence to believe and conscientiously entertain an honest and strong

4    suspicion that the person is guilty of a crime."  *People v. Ingle*, 53 Cal. 2d 407, 412 (1960).  "The

5    test is not whether the evidence upon which the officer acts in making the arrest is sufficient to

6    convict but only whether the person should stand trial."  *Id.*

7          As an initial matter, petitioner voluntarily represented himself for a portion of his pre-trial

8    proceedings.[3]  RT 1-B at 60.  To the extent these pre-trial proceedings occurred during the time

9    period in which a 995 motion would have been properly made, petitioner cannot claim ineffective

10   assistance of counsel.[4]

11         At the preliminary hearing, petitioner's counsel disputed the sufficiency of the evidence in

12   support of the robbery charge.  At that hearing, the court heard testimony from Ocon, RT 1-B at

13   12, Officer Bunch, *id*. at 46, and Officer Zavala, *id*. at 52.  Ocon testified that he asked petitioner

14   to give him his phone back, that petitioner assaulted Ocon, that petitioner beat Ocon with the pool

15   stick, that petitioner grabbed his wallet, that money was missing from his wallet, and that he

16   sustained serious injuries.  *Id*. at 18-28.  Officer Bunch testified that he found Ocon's phone on

17   petitioner and that he did not notice any visible injuries on petitioner.  *Id*. at 46-49.  Officer

18   Zavala testified that Ocon stated that petitioner assaulted him and that $200 was missing from

19   Ocon's wallet.  *Id*. at 53-57.  After the evidence was presented, petitioner's counsel argued that

20   there was no proof that petitioner used force or fear to take Ocon's phone, as required for a

21   robbery conviction, and that there was no evidence that petitioner took Ocon's wallet or any of

22   the contents of the wallet.  *Id*. at 59.  However, the court found that the evidence presented at the

23   _____

24   [2] A 995 motion is made after the presentation of evidence at the preliminary hearing and prior to trial.

25   [3] In the hearing on petitioner's motion to represent himself, the court advised petitioner that he would be at a great disadvantage if he represented himself, but ultimately granted petitioner's

26   motion.  RT 1-B at 65.

27   [4] During this time, petitioner filed a "motion to dismiss for due process."  RT 2:201.  The court denied petitioner's motion, finding that it was untimely and not properly served on the
     government.  Substitute counsel entered his appearance on behalf of petitioner prior to the start of

28   trial.  RT 4.

1   preliminary hearing was sufficient to meet the reasonable and probable cause standard required to

2   hold petitioner to answer for the charge. *Id.*

3       Although the undersigned has found no evidence that petitioner's counsel filed a 995

4   motion after the preliminary hearing, petitioner has failed to present any arguments that the

5   evidence presented at his preliminary hearing was so sparse as to warrant such a motion.

6   Considering the testimony of the three witnesses and the trial court's finding of reasonable and

7   probable cause, petitioner's counsel could have determined that seeking relief through a 995

8   motion would have been futile. Moreover, petitioner's counsel made numerous other pre-trial

9   motions on petitioner's behalf, including motions to exclude evidence prejudicial to petitioner.

10  RT 13:1401-10. Giving a "heavy measure of deference" to petitioner's counsel's strategic

11  decisions, *Strickland*, 466 U.S. at 690-91, and recognizing that counsel had no duty to raise

12  frivolous arguments, *Jones v. Barnes*, 463 U.S. 745, 751 (1983), petitioner has failed to show that

13  his trial counsel's performance was deficient. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir.

14  2005) (explaining that attorneys have no duty to raise meritless arguments).

15      Moreover, petitioner has not demonstrated that he was prejudiced by his counsel's

16  actions—meaning that there is a reasonable probability that the proceeding would have turned out

17  better for him had his counsel filed a 995 motion. Considering the trial court's finding of

18  reasonable and probable cause for the robbery charge, the undersigned expects that a 995 motion

19  would have been denied. Petitioner has presented no evidence that leads us to think otherwise.

20  Petitioner's claim should be rejected.

21              **3. Self-defense**

22      Petitioner contends that his counsel was ineffective based on his failure to present a self-

23  defense theory at trial. ECF No. 15 at 12. Contrary to petitioner's claim, his counsel did present

24  self-defense as a theory at trial. Therefore, petitioner's claim should be rejected.

25      As an initial matter, petitioner's counsel presented a theory of self-defense through

26  petitioner's own trial testimony. Petitioner testified that Ocon was the initial aggressor, that Ocon

27  first grabbed his wrist and then hit petitioner on the head twice with the pool stick, and that Ocon

28  climbed on top of him in the backseat of the car. RT 14:1667-74. Petitioner stated that he did not

1   want to hurt Ocon, but rather wanted to get away from Ocon.  *Id*.  Petitioner attested that he was

2   fighting for his life, that he believed Ocon was trying to kill him with the pool stick, and that

3   Ocon hit him so hard with the pool stick that he "knocked [petitioner] out."  *Id*.  Petitioner

4   testified that Ocon climbed on his back and choked him, that petitioner bit one of Ocon's fingers

5   to try to stop Ocon from choking him, that petitioner could not breathe, and that petitioner head

6   butted Ocon three to four times in an attempt to stop Ocon's attacks.  *Id*. at 1675.  Petitioner

7   stated that witnesses were screaming at Ocon to stop attacking petitioner, that petitioner was

8   screaming for help, that a bystander helped get Ocon off petitioner's back, and that Ocon hit the

9   bystander with the pool stick.  *Id*. at 1682.  Petitioner's counsel also presented, through

10  petitioner's testimony, an explanation for petitioner's lack of injuries, the presence of blood on

11  petitioner's back, and the lack of blood on petitioner's hands.  *Id*. at 1695-96.

12      Petitioner's counsel, in closing, reminded the jury that Ocon could not remember many of

13  the details of the incident, including whether Ocon put petitioner in a chokehold.  RT 14:1753-55.

14  Petitioner's counsel explained to the jury that they should find petitioner lawfully defended

15  himself he believed he was in imminent danger of suffering serious bodily injury and that

16  petitioner used no more force than was necessary to defend himself.  *Id*. at 1764-65.  Petitioner's

17  counsel reminded the jury that petitioner was unable to escape from Ocon without the help of the

18  bystander, and upon becoming free, petitioner ran away from Ocon.  *Id*. at 1765.  Petitioner's

19  counsel emphasized that neither petitioner's blood nor his fingerprints were found on the pool

20  stick.  *Id*. at 1757.  Petitioner's counsel also called into question the relevance and reliability of

21  the picture of petitioner taken after the incident.[5]  *Id*. at 1758.

22      The undersigned cannot find petitioner's counsel's performance deficient.  His counsel

23  presented petitioner's theory of self-defense to the jury through petitioner's own testimony and

24  then summarized this testimony in his closing argument.  Petitioner has not pointed to any

25  _____

    [5] Notably, the trial court instructed the jury on self-defense, stating that the defense is available
26  upon a finding that "the defendant reasonably believe[d] that he or someone else was in imminent
    danger of being touched unlawfully . . . [and] that the defendant reasonably believed that the
27  immediate use of force was necessary to defend against that danger and that defendant used no
    more force than was reasonably necessary to defend against that danger."  RT 14:1797.
28

1    additional actions that his counsel should have taken to advance a theory of self-defense.

2    Moreover, the undersigned cannot find that petitioner was prejudiced by his counsel's alleged

3    shortcomings; he has not demonstrated how the results of his trial would have been different had

4    his counsel presented additional self-defense arguments, much less that any additional evidence to

5    support a self-defense theory existed.

6    **4.  Parole testimony**

7    Petitioner contends that his counsel was ineffective because he allowed a police officer to

8    testify that petitioner was on parole at the time of the incident.  ECF No. 15 at 12.  Petitioner's

9    argument is not supported by the record and should be rejected.  At trial, the prosecution, in

10    questioning Officer Bunch on the chronology of the events, asked "What happened next?"  RT

11    13:1604.  In response, the police officer stated that he and his colleagues "determined that

12    [petitioner] was on active . . . parole."  *Id*. at 1605.  Petitioner's counsel objected to the question

13    and moved to strike the police officer's answer.  *Id*.  The prosecutor stated, "how about I'll just

14    withdraw the question and agree that it should be stricken."  *Id*.  Accordingly, the prosecutor's

15    question was withdrawn and the police officer's statement was stricken from the record.[6]  *Id*.

16    While subsequently giving jury instructions, the court admonished the jury that if "testimony

17    [was] stricken from the record, you must disregard it and must not consider that testimony for any

18    purpose."  RT 14:1783.

19    Considering that petitioner's counsel promptly objected to the question and moved to

20    strike the answer, petitioner has failed to show how his counsel's performance was deficient.  The

21    undersigned cannot find that any further action by petitioner's counsel was required under

22    *Strickland*.  Even if petitioner were to argue that his counsel somehow should have anticipated

23    that the question "What happened next?" would have elicited an answer about petitioner's parole

24    status, attorneys are not expected to be "flawless," and they may not be "faulted for a reasonable

25    miscalculation or lack of foresight or for failing to prepare for what appear to be remote

26

27    [6] Relatedly, petitioner's counsel, in closing, stated that the jury should consider the evidence of petitioner's testimony related to the incident only and should not consider petitioner's prior felony

28    conviction as propensity evidence.  RT 14:1756.

1  possibilities." *Richter*, 562 U.S. 86, 110 (2011).  Moreover, considering that the answer was

2  stricken from the record and that the court admonished the jury to disregard the answer, petitioner

3  has failed to show how he was prejudiced by his counsel's alleged failure.

4                **ii.  Appellate Counsel**

5        Petitioner contends that his appellate counsel was ineffective because he failed to raise

6  claims of ineffective assistance of trial counsel and actual innocence on appeal.  ECF No. 15 at

7  10.  This court reviews the last reasoned decision on this claim—that of the superior court—and

8  apply the deferential standard of § 2254.  Lodged Doc. No. 33; *see Van Lynn v. Farmon*, 347 F.3d

9  735, 738 (9th Cir. 2003) (explaining that "[b]ecause, here, neither the court of appeal nor the

10  California Supreme Court issued a reasoned opinion on the merits of this claim, this court looks

11  to the trial court's decision" on federal habeas review).[7]  The superior court rejected petitioner's

12  claim, finding that petitioner failed to:

13
14         present any facts or evidence that would demonstrate a reasonable
          probability that the result of his appeal would have been more
          favorable had his attorney argued that he only borrowed the
15         victim's iPhone [and] that he acted in self-defense.  As Petitioner
          has failed to demonstrate that he was prejudiced by his appellate
16         attorney's actions or inactions, the Court finds that he has failed to
          establish that he received ineffective assistance of counsel on
17         appeal.

18  Lodged Doc. No. 33 at 1-3.

19        A defendant's right to appellate representation does not include a right to present

20  frivolous arguments to the court.  *See McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S. 429,

21  436 (1988); *Morrison v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992) (explaining that appellate

22  counsel cannot be found ineffective for failing to raise an argument that would not have been

23  successful).  And no U.S. Supreme Court decision holds that a "defendant has a constitutional

24  right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel,

25  as a matter of professional judgment, decides not to present those points."  *Barnes*, 463 U.S. at

26  751; *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting that appellate counsel need not present

27  _____

28  [7] Petitioner's claim was also summarily rejected by the California Supreme Court.  Lodged Doc.
   No. 41.

1  every non-frivolous issue on appeal, "but rather may select from among them in order to

2  maximize the likelihood of success on appeal").

3         Here, petitioner's claims of ineffective assistance of trial counsel, *supra*, and actual

4  innocence, *infra*, are without merit.  Accordingly, this court cannot find that petitioner's appellate

5  counsel's performance was deficient for failure to raise these claims.  Because this court gives a

6  "heavy measure of deference" to petitioner's counsel's strategic decisions, *Strickland*, 466 U.S. at

7  690-91, and recognize that counsel had no duty to raise frivolous arguments, *Barnes*, 463 U.S. at

8  751, the undersigned finds that petitioner has failed to show that his appellate counsel's

9  performance was deficient.  Moreover, petitioner has failed to show that he was prejudiced by his

10  attorney's actions.  Because he has failed to show that the claims in question are meritorious, he

11  has also failed to show that the result of his appeal would have been different had his appellate

12  counsel presented these claims.  Petitioner's claim should be rejected.

13                **b.  Actual Innocence Claim**

14         Petitioner claims that he is innocent of his convictions.  ECF No. 15 at 14.  Petitioner

15  claims that because he borrowed Ocon's phone, he is innocent of robbery.  *Id*. at 14-15.  And

16  petitioner claims that because Ocon was the initial aggressor, petitioner had the right to self-

17  defense and that he is therefore innocent of battery.  *Id*.  This court reviews the last reasoned

18  decision on this claim—that of the superior court—and apply the deferential standard of § 2254.

19  Lodged Doc. No. 33; *see Van Lynn*, 347 F.3d at 738.[8]  The superior court rejected petitioner's

20  claim, finding that he failed to meet California's requirements for raising a claim of actual

21  innocence.  Lodged Doc. No. 33 at 3-4.  To gain relief on a claim of actual innocence in

22  California, a petitioner must present newly discovered evidence that casts "fundamental doubt on

23  the accuracy and reliability of the proceedings."  *In re Lawley*, 42 Cal. 4th 1231, 1239 (2008).

24  This evidence must "undermine the entire prosecution case and point unerringly to innocence or

25

26

27  _____

28  [8] Petitioner's claim was also summarily rejected by the California Supreme Court.  Lodged Doc.
   No. 41.

1  reduced culpability.  If a reasonable jury could have rejected the evidence presented, a petitioner

2  has not satisfied his burden." *Id.*

3        Petitioner's claim fails.  As an initial matter, this court is bound by the state court's ruling

4  because the state court relied on California state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67

5  (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Bradshaw v. Richey*,

6  546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . .

7  . binds a federal court sitting in habeas corpus.").  Second, even if this court were not bound by

8  the state court's ruling, the undersigned could not consider petitioner's claim.  The U.S. Supreme

9  Court has not extended federal habeas review to freestanding actual innocence claims.  *See*

10  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)

11  ("We have not resolved whether a prisoner may be entitled to habeas relief based on a

12  freestanding claim of actual innocence."); *United States v. Quiroz*, 706 Fed. App'x. 423, 423 (9th

13  Cir. 2017) ("Neither the [Ninth Circuit] nor the Supreme Court has recognized freestanding actual

14  innocence claims as legally cognizable.").  Accordingly, petitioner's claim should be rejected.[9]

15                    **c.  Motion for the Appointment of Counsel**

16        Petitioner moved for the appointment of counsel.  ECF Nos. 25, 26.  A petitioner in a

17  habeas proceeding does not have an absolute right to counsel.  *See Anderson v. Heinze*, 258 F.2d

18  479, 481 (9th Cir. 1958).  There are three specific circumstances in which appointment of counsel

19  is required in habeas proceedings.  First, appointment of counsel is required for an indigent

20  person seeking to vacate or set aside a death sentence in post-conviction proceedings under 28

21  U.S.C §§ 2254 or 2255.  *See* 18 U.S.C. § 3599(a)(2).  Second, appointment of counsel may be

---

[9] Even if the court were to consider the merits of petitioner's actual innocence claim, his claim is without merit.  Petitioner has presented no evidence beyond his own trial testimony that demonstrates that he is innocent of his convictions.  The jury heard evidence that could support a guilty finding, including evidence that Ocon asked petitioner to return his phone, that petitioner was later found with Ocon's phone in his pocket, that Ocon was hospitalized for three days due to severe injuries, and that petitioner had few injuries.  The jury, which was tasked with weighing the credibility of all the evidence presented at trial, found petitioner guilty considering this evidence.  *See United States v. Brady*, 579 F.2d 1121, 1127 (9th Cir. 1978) (noting that "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts").

18

1   required if an evidentiary hearing is warranted.  *See* Rules Governing § 2254 Cases 8(c).  Third,

2   appointment of counsel may be necessary for effective discovery.  *See id*. at 6(a).  None of these

3   situations is present here.

4          This court is further authorized to appoint counsel for an indigent petitioner in a habeas

5   corpus proceeding if the court determines that the interests of justice require the assistance of

6   counsel.  *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986); 18 U.S.C. § 3006A(a)(2)(B).

7   However, "[i]ndigent state prisoners applying for habeas corpus relief are not entitled to

8   appointed counsel unless the circumstances of a particular case indicate that appointed counsel is

9   necessary to prevent due process violations."  *Chaney*, 801 F.2d at 1196.  In assessing whether to

10  appoint counsel, this court evaluates the petitioner's likelihood of success on the merits as well as

11  the ability of the petitioner to articulate his claims without counsel, considering the complexity of

12  the legal issues involved.  *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).

13         The undersigned cannot conclude that counsel is necessary to prevent a due process

14  violation.  Petitioner has articulated his claims to this court and the undersigned does not find his

15  claims meritorious.  Accordingly, the undersigned finds that appointed counsel is not necessary to

16  guard against a due process violation and that the interests of justice do not require the

17  appointment of counsel.

18      **III.    Certificate of Appealability**

19         A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

20  court's dismissal of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C.

21  § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing Section 2254

22  Cases requires a district court to issue or deny a certificate of appealability when entering a final

23  order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116

24  F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner

25  makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

26  This standard requires the petitioner to show that "jurists of reason could disagree with the district

27  court's resolution of his constitutional claims or that jurists could conclude the issues presented

28  are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord*

19

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue a certificate of appealability.

### IV.    Findings and Recommendations

For the foregoing reasons, the undersigned recommends that the court deny the petition, ECF No. 15, and decline to issue a certificate of appealability.  These findings and recommendations are submitted to the U.S. district judge presiding over the case under 28 U.S.C. § 636(b)(1)(B) and Local Rule 304.  Within thirty days of the service of the findings and recommendations, the parties may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The presiding district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

### V.    Order

Petitioner's motions for the appointment of counsel, ECF Nos. 25, 26, are denied.

IT IS SO ORDERED.

Dated:    August 27, 2020

UNITED STATES MAGISTRATE JUDGE

No. 206.